UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CINDY ADAMS,<br><br>                    Plaintiff,<br><br>         v.<br><br>CITY OF REDDING, et al.,<br><br>                    Defendants. | No. 2:20-cv-01610-TLN-DMC<br><br>**ORDER** |

This matter is before the Court on Defendants City of Redding, Kyle Corrigan ("Corrigan"), Christopher Staup ("Staup"), and Edward McGinnis's ("McGinnis") (collectively, "Defendants") Motion for Summary Judgment. (ECF No. 36.) Plaintiff Cindy Adams ("Plaintiff") filed an opposition. (ECF No. 38.) Defendants filed a reply. (ECF No. 42.) For the reasons set forth below, the Court GRANTS in part and DENIES in part Defendants' motion.

///
///
///
///
///

1

I.     **FACTUAL AND PROCEDURAL BACKGROUND**[1]

On December 22, 2019, Officers Corrigan, Staup, and McGinnis patrolled Redding, California. (ECF No. 38-1 at 19.) Staup and McGinnis had civilian ride along passengers in their respective patrol vehicles. (*Id.*) At approximately 3:15 a.m., Corrigan observed a white Toyota Scion with Washington State license plates travel past him northbound on Market Street. (*Id.* at 21.) Corrigan followed the Scion, driven by Jesse Adams ("Adams"), to observe his driving given the high number of DUI arrests that evening. (*Id.*) Adams had two passengers with him in the Scion. (*Id.* at 20.) Corrigan observed the Scion drift from the center lane to the right lane without signaling, then turn on its left blinker to return to the center lane. (*Id.* at 21.) Corrigan activated his overhead lights to initiate a stop while radioing dispatch to run the Scion's license plate. (*Id.* at 21–22.)

Adams pulled the Scion into a parking lot and parked in one of the stalls. (*Id.* at 22.) Corrigan approached the vehicle and advised Adams of the reason he had been pulled over. (*Id.*) Corrigan then received a message from the dispatcher that the license plate on the Scion was associated with a person wanted on a felony warrant in Washington State. (*Id.* at 22–23.) Adams told Corrigan he could not locate his driver's license, so Corrigan asked for Adams's name and for Adams to spell it. (*Id.*) Adams responded that his name was Nicolas McGinnis. (*Id.*) Corrigan then radioed Staup to respond to the scene to conduct a DUI investigation. (*Id.*)

McGinnis and Staup arrived on the scene and formed a staggered line with their vehicles that blocked the parking lot exit. (*Id.* at 24.) The officers planned to remove Adams and his two passengers from the Scion. (*Id.* at 25.) When the officers approached the vehicle, Adams refused to roll his window down or unlock his door after the officers instructed him to do so. (*Id.*) While the car was still running, Staup saw Adams attempt to put the car into gear. (*Id.*) Corrigan then yelled at Adams to place his hands on the steering wheel and warned him that he would break his window if he did not comply. (*Id.* at 26.) Adams's hand remained on the gear shift lever. (*Id.*) Corrigan then broke the driver-side window with his baton, tried to pull Adams from the vehicle,

---

[1]    The facts herein are undisputed unless otherwise indicated.

2

1   and used pepper spray. (*Id.*) As Corrigan prepared to pepper spray Adams a second time, Adams
2   put the car in reverse, accelerated backward, and hit the embankment on the other side of the
3   parking lot. (*Id.* at 27.) Once on the embankment, the Scion paused for a short period of time,
4   and Adams revved the engine. (*Id.*) The Scion then accelerated forward and collided with
5   Staup's patrol vehicle, which contained a civilian ride along passenger. (*Id.* at 29–30.)
6       The parties dispute most of what happened thereafter. In Defendants' version of events,
7   after the Scion collided with Staup's vehicle, the Scion's engine continued to rev, the Scion's tires
8   were squealing, and the car was pushing Staup's vehicle backwards toward the street. (*Id.* at 30.)
9   Staup approached the Scion and observed Adams attempting to put the vehicle in reverse with his
10  left hand while also reaching with his right hand for the floorboard on the passenger side. (*Id.* at
11  30–31.) After seeing Adams trying to get the Scion into gear and reach for something on the
12  floorboard, Staup stepped up to the driver's window and shot Adams in the chest. (*Id.* at 32.)
13      Plaintiff disputes Defendants' narrative and offers a different version of events. In
14  Plaintiff's version of events, Staup shot Adams in the chest approximately 10 to 15 seconds after
15  the Scion impacted Staup's vehicle. (ECF No. 38-2 at 16.) No officer was in the path of the
16  Scion immediately prior to or when Staup shot Adams. (*Id.* at 17.) The Scion was stopped and
17  not moving when Staup shot Adams, there is no indication the Scion's tires were spinning, and
18  the Scion never moved in reverse after the collision. (*Id.*) As such, Plaintiff asserts Adams was
19  not an immediate threat of death or serious bodily injury at the time of the shooting. (*Id.* at 18.)
20      The parties also provide video footage of the incident. (Dft's Exh. A; Pltf's Exh. 9.) Both
21  videos appear to be taken from the same security camera, with Plaintiff's video starting from the
22  time Adams was pulled over and Defendants' video only showing the moments right before the
23  shooting. Neither video includes audio. Because Plaintiff's video shows more of the events
24  leading up to the shooting, the Court only references Plaintiff's video herein. The video shows a
25  patrol vehicle pulling over the Scion into what appears to be a narrow parking lot. (Pltf's Exh. 9
26  at 00:02.) The Scion parks in a stall, and an officer exits his patrol vehicle and approaches the
27  Scion. (*Id.* at 00:25.) Approximately five minutes later, two other patrol vehicles arrive at the
28  scene and appear to block the parking lot exit. (*Id.* at 05:50.) The officers exit their vehicles and

approach the Scion. (*Id.* at 06:00–07:30.) A few minutes later, the video shows the Scion suddenly drive in reverse, stop for a moment, accelerate forward, and then collide with a patrol vehicle. (*Id.* at 09:12–09:25.) It appears all the officers were able to remove themselves from the path of the Scion. (*Id.*) It is unclear from the footage whether the Scion continued to move after the collision, but the Scion appears to be wedged between patrol vehicles and unable to move. (*Id.*) It is also unclear from the footage at what point Staup shot Adams.

Adams died as a result of the incident. (ECF No. 38-2 at 25.) Plaintiff, Adams's mother, initiated this action on behalf of Adams's estate and on her own behalf on August 11, 2020. (ECF No. 1.) Plaintiff filed the operative Second Amended Complaint ("SAC") on June 16, 2021, alleging claims for: (1) excessive force under the Fourth Amendment and denial of medical care under the Fourteenth Amendment under 42 U.S.C. § 1983 ("§ 1983"); (2) municipal liability for custom/policy/practice under *Monell*; (3) battery; (4) negligence; (5) failure to train under § 1983; and (6) a violation of the Tom Bane Civil Rights Act (Cal. Civ. Code § 52.1) ("Bane Act"). (ECF No. 28.) Defendants filed the instant motion for summary judgment on January 31, 2024. (ECF No. 36.)

## II. STANDARD OF LAW

Summary judgment is appropriate when the moving party demonstrates no genuine issue of any material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id*. at 324 (internal quotation marks omitted). Indeed, summary judgment should be entered against a party who does not make a showing sufficient to establish the existence of an element essential to

4

1 that party's case, and on which that party will bear the burden of proof at trial.

2 If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(c). The opposing party must demonstrate that the fact in contention is material, *i.e.*, a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that the dispute is genuine, *i.e.*, the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id*. at 251–52.

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Ariz.*, 391 U.S. at 288–89. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with any applicable affidavits. Fed. R. Civ. P. 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982). The evidence of the opposing party is to be believed and all reasonable inferences that may be drawn from the facts pleaded must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987). Finally, to demonstrate a genuine issue that necessitates a jury trial, the opposing party "must do more

than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id*. at 587.

**III. ANALYSIS**

Defendants argue they are entitled to summary judgment as to all of Plaintiff's claims. (ECF No. 36-1.) The Court will first address Plaintiff's claims against the individual officers and then the *Monell* claim against the City.

    A.    <u>Claims Against the Individual Officers</u>

        *1.    Excessive Force Under § 1983*

Plaintiff alleges the officers used excessive force in violation of the Fourth Amendment. The Fourth Amendment protects the "right of the people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment permits officers making an arrest to use force, but only an amount that is objectively reasonable under the circumstances. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

Defendants argue the Court should grant summary judgment on Plaintiff's excessive force claim because the officers' actions were objectively reasonable. (ECF No. 36-1 at 17.) More specifically, Defendants argue Staup's use of deadly force was justified based on Adams's actions and Plaintiff cannot sustain a claim against McGinnis and Corrigan for their conduct leading up to the shooting. (*Id.* at 17–21.) In opposition, Plaintiff argues Staup's lethal shooting of Adams was unreasonable because Adams was unarmed and in a stopped vehicle. (ECF No. 38 at 14.) Plaintiff also argues McGinnis and Corrigan may be held liable as integral participants because they were fundamentally involved in the incident. (*Id.* at 16.) The Court will address the excessive force claim against Staup and then the excessive force claims against McGinnis and Corrigan.

        *a. Excessive Force Claim Against Staup*

It is undisputed that Staup used deadly force. "The intrusiveness of a seizure by means of deadly force is unmatched." *Garner*, 471 U.S. at 9. However, "whether or not [Staup's] actions constituted application of 'deadly force,' all that matters is whether [his] actions were

1  reasonable." *Scott v. Harris*, 550 U.S. 372, 383 (2007). The inquiry is objective. *Graham v. Connor*, 490 U.S. 386, 397 (1989); *Glenn v. Wash. Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011). The vantage point is that of a reasonable officer confronted with the same facts, bearing in mind the decisions occurred in a "split" second and making every effort to ignore the advantages of "20/20 vision of hindsight." *Graham*, 490 U.S. at 396–97.

In determining whether Staup's actions were objectively reasonable, the Court "must balance the nature of the intrusion upon an individual's rights against the countervailing government interests at stake, without regard for the officers' underlying intent or motivations." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019), *cert. denied sub nom. Browder v. Nehad*, 141 S. Ct. 235 (2020) (citing *Graham*, 490 U.S. at 396–97). "Whether a use of force was reasonable will depend on the facts of the particular case, including, but not limited to, whether the suspect posed an immediate threat to anyone, whether the suspect resisted or attempted to evade arrest, and the severity of the crime at issue." *Id.* "The most important *Graham* factor is whether the suspect posed an immediate threat to anyone's safety." *Id.* (citing *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc)).

Reasonableness of force is usually a fact question for the jury. *A.G.1 by & through Uribe v. City of Fresno*, No. 1:16-CV-01914-LJO-SAB, 2018 WL 4042906, at *4 (E.D. Cal. Aug. 22, 2018) (citing *Liston v. Cnty. of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997)). "Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Id.* (quoting *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012)).

Defendants argue the material facts are not in dispute and the video evidence confirms the officers' version of events. (ECF No. 36-1.) Specifically, Defendants argue the undisputed facts show: (1) the officers were informed that Adams was wanted in the State of Washington for burglary charges; (2) Adams's behavior was consistent with drug use; and (3) Adams failed to comply with the officers' orders, attempted to evade the officers, and created an immediate threat to officer safety by driving the Scion wildly in a confined space. (ECF No. 36-1 at 17.)

1   Defendants argue these facts establish that Staup's use of deadly force was reasonable. (*Id.*)

2   As Plaintiff correctly points out, Defendants fail to cite evidence to support these

3   arguments. (*See id.* at 17–18; ECF No. 38-1 at 7.) First, as to Defendants' argument that "the

4   officers were informed that Adams was wanted in the State of Washington for burglary charges,"

5   the Court is unable to locate evidence to support such an assertion. While it is undisputed the

6   officers knew there was a felony warrant associated with the license plates on the Scion,

7   Defendants fail to cite evidence establishing that the officers knew the warrant was based on a

8   burglary. Second, as to Defendants' argument that "Adams's behavior was consistent with drug

9   use," the Court notes that while Corrigan stated in his deposition that he suspected Adams was

10  intoxicated, Corrigan offered no specific details about Adams's conduct that led to his suspicion.

11  The Court finds Defendants' first and second arguments to be unsupported, undeveloped, and

12  ultimately, unpersuasive.

13  Third, and most importantly, while there is some evidence Adams failed to comply with

14  the officers' orders and attempted to evade arrest, there is conflicting evidence as to whether

15  Adams posed an immediate threat during the critical moments before Staup shot Adams. (ECF

16  No. 36-1 at 18.) Defendants primarily rely on Staup's declaration, dated January 23, 2024. (ECF

17  No. 36-2 at 7.) In his declaration, Staup stated,

> After colliding with my patrol car, I could tell the driver still had the accelerator floored as the engine was revving loudly and the tires were squealing. It appeared to me that he was trying to push my patrol car back into the street, which would have been extraordinarily dangerous if anyone happened to be driving up Pine Street. While the engine was still revving loudly, I could see that the driver was shaking the gear selector wildly with his left hand, as if he was trying to put the car into reverse again. At the same time, he appeared to be reaching for something on the floorboard. The result was that he had his side exposed to me. At this point, I felt I had to stop the driver with way I could. If he put the car into reverse again, he could easily end up killing one of the other officers. If he tried to force his was out of the parking lot by crashing into the patrol cars again, he could seriously injure my wife or the other civilian ride along. Seeing the driver trying to put the car in gear again and reaching for the floorboard, I stepped up to the driver's side window, I aimed at his upper left torso, and took a single shot with my service weapon. I did not feel like there was any time for a verbal warning. The driver immediately slumped forward and stopped moving.

28  (ECF No. 36-4 at 4–5.)

8

1         In opposition, however, Plaintiff cites Staup's deposition testimony from October 12, 2021, in which Staup testified that although the Scion's engine was revving when he shot Adams, he did not remember whether the Scion was in gear and still moving forward. (ECF No. 40-4 at 69.) Staup testified he thought the Scion was "mostly stationary at that point." (*Id.*) Staup testified he did not know if the Scion was pushing the patrol vehicle, he could not remember if he saw Adams's left hand on the gear shifter, and he did not see the Scion's tires spinning. (*Id.* at 70–71, 75, 77.)

         Notably, when he was unable to recall certain material facts about the incident during his 2021 deposition, Staup repeatedly stated "it's been over two years." (*Id.* at 71, 84.) Yet Staup was somehow capable of providing a much clearer, conflicting narrative of the incident in his 2024 declaration. These contradictions and credibility determinations should be resolved by a trier of fact rather than by summary judgment. *See First Nat'l Bank*, 391 U.S. at 288–89. This is even more true for excessive force claims, and the Ninth Circuit has held on many occasions that summary judgment should be granted sparingly for such claims. *Glenn*, 673 F.3d at 871; *see also Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002) ("[W]e have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.").

         Further, the Court disagrees with Defendants' assertion that the video footage confirms Defendants' version of events. It is true that when a video records the events in question, no genuine dispute of fact exists for anything that is clearly discernable in the recording. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). However, the video footage in the instant case is far from clear — rather, it is blurry, shows the events from a distance, and does not include audio. Defendants assert "it would be obvious to any reasonable person that if Adams were allowed to put his vehicle into reverse and to again try to crash his way out of the parking lot, the lives of the officers, the civilian ride-along passengers, and the passengers in Adams's vehicle, would all be in mortal danger." (ECF No. 36-1 at 18.) Yet the video arguably shows that after the collision, the Scion was wedged between patrol vehicles and unable to move and that there were no individuals in the path of the Scion in either direction. Moreover, without audio, it is unknown

9

whether Adams's tires were spinning, whether the engine was revving, and at what point Staup fired his weapon.² Looking at the video in the light most favorable to Plaintiff, a trier of fact could determine that Adams no longer posed a serious threat to the officers after he collided with Staup's vehicle. *Vos v. City of Newport Beach,* No. 16-56791, 892 F.3d 1024, 1028 (9th Cir. 2018) ("[V]ideo footage of the incident does not foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that footage.").

Lastly, Defendant analogizes the instant case to *Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010) and *Monzon v. City of Murrieta*, 978 F.3d 1150 (9th Cir. 2020). Both cases are distinguishable. In *Wilkinson*, an officer shot and killed the driver of a stolen minivan after the minivan had crashed in a muddy, slippery yard during a pursuit. 610 F.3d at 548–49. At the time of the shooting, "[t]he minivan was accelerating, its tires were spinning, mud was flying up, and a fellow officer was nearby either lying fallen on the ground or standing but disoriented." *Id.* at 551. In *Monzon*, the police shooting occurred after an erratic, high-speed car chase. 978 F.3d at 1154. Officers shot the suspect after he was still driving and turning his car toward the officers, and then continued to shoot after the suspect crashed his van into a police cruiser. *Id.* at 1158. Notably, it was undisputed in *Monzon* that the car crashed with enough force to push the cruiser into one of the officers. *Id.* In contrast to both *Wilkinson* and *Monzon*, there are factual disputes as to whether any individual was in immediate danger in the instant case. For example, taking the facts and all reasonable inferences in the light most favorable to Plaintiff, the Scion appeared to be stopped and unable to move after colliding with Staup's vehicle and no officers appeared to be in the path of the Scion.

For the foregoing reasons, the Court finds a reasonable jury could conclude that Adams did not pose an immediate threat that warranted the use of deadly force. *See Gonzalez v. City of Anaheim*, 747 F.3d 789, 794 (9th Cir. 2014) ("The key issue in this case is whether a reasonable jury would necessarily find that [the officer] perceived an immediate threat of death or serious

---

² Corrigan and McGinnis testified in their depositions that the shot was fired between 10 to 15 seconds after the collision. (ECF No. 40-1 at 80–81 (10 to 15 seconds); ECF No. 40-3 at 39 (10 seconds).)

10

1    physical injury at the time he shot [the suspect] in the head."); *see also Vos*, 892 F.3d at 1032
2    (concluding "a reasonable jury could conclude that [the suspect] was not an immediate threat to
3    the officers" when the officers outnumbered the suspect eight to one, did not believe the suspect
4    had a gun, and had less lethal methods available to stop the suspect from charging); *Villanueva v.*
5    *California*, 986 F.3d 1158, 1170 (9th Cir. 2021) ("We have consistently found use of deadly force
6    to stop a slow-moving vehicle unreasonable when the officers could have easily stepped out of
7    the vehicle's path to avoid danger."). The Court thus concludes there is a genuine dispute of
8    material fact as to whether Staup used unreasonable force under *Graham*.

9    Accordingly, the Court DENIES Defendants' motion as to Plaintiff's excessive force
10   claim against Staup.

            b.   *Excessive Force Claims Against McGinnis and Corrigan*

12   Defendants next argue Plaintiff fails to establish Corrigan or McGinnis used excessive
13   force. (ECF No. 36-1 at 21.) In opposition, Plaintiff argues Corrigan is independently liable for
14   his excessive force in breaking the Scion's window with a baton, grabbing Adams, and pepper
15   spraying Adams twice. (ECF No. 38 at 15.) Plaintiff also argues Corrigan and McGinnis may be
16   held liable as integral participants to Staup's use of deadly force. (ECF No. 38 at 16.)

17   The parties' briefing on this issue is inadequate. As to Corrigan's individual actions, it is
18   undisputed that Corrigan used his baton to shatter Adams's window, reached into the vehicle to
19   try to pull Adams out, and used pepper spray on Adams. (ECF No. 38-1 at 26–27.) However,
20   neither party applies the *Graham* factors when discussing Corrigan's conduct. In Defendants'
21   moving papers, they argue in a single, conclusory sentence that "Corrigan's breaking of Adams's
22   window and use of pepper spray was objectively reasonable under the circumstances as Adams
23   was 'violently' moving the gear selector in an apparent intent to put the car in gear, and was
24   revving the engine." (ECF No. 36-1 at 21.) Although Defendants attempt to bolster this
25   argument in their reply, Defendants' reply brief fails to cite legal authority on this issue and fails
26   to analyze Corrigan's conduct within the *Graham* framework. (ECF No. 42 at 7–8.) Ultimately,
27   the Court need not and does not consider arguments raised for the first time in reply that could
28   have been raised in Defendants' moving papers. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir.

2007).  Based on the limited briefing before the Court, the Court cannot say Corrigan's individual actions were objectively reasonable as a matter of law.

However, the Court agrees with Defendants that they are entitled to summary judgment as to Plaintiff's excessive force claim against McGinnis.  Plaintiff does not cite, nor can the Court locate, any allegations about McGinnis using force against Adams.  Instead, Plaintiff only argues McGinnis is liable as an "integral participant" in the group conduct.  (ECF No. 38 at 16.)

"In some situations, the Constitution may impose on an officer a duty to intervene to prevent an ongoing constitutional violation." *Peck v. Montoya*, 51 F.4th 877, 889 (9th Cir. 2022).  "But in general, one does not 'subject' someone to a deprivation of a constitutional right — or 'cause [someone] to be subjected' to such a deprivation — simply by watching others violate the Constitution."  *Id.*  "To be liable under [§] 1983, a defendant official must be more than a mere bystander."  *Id.* (citing *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 941 (9th Cir. 2020)) (internal quotation marks omitted).  "[A]n official whose individual actions do not themselves rise to the level of a constitutional violation may be held liable under [§] 1983 only if the official is an 'integral participant' in the unlawful act." *Id.* (internal quotation marks omitted).

Plaintiff vaguely argues "[e]very officer participated in the plan, participated in the yelling at the occupants, failed to de-escalate the situation, failed to remain behind cover, failed to communicate with each other, failed to work as a team to position themselves appropriate instead of creating the peril, and knew about Corrigan's and Staup's uses of force when deployed." (ECF No. 38 at 16.)  Plaintiff does not cite legal authority to support the argument that this conduct would be sufficient to establish liability under an integral participant theory, nor does Plaintiff cite any evidence as to McGinnis's conduct specifically.  As such, Plaintiff has failed to raise a triable issue that McGinnis was anything more than a "mere bystander" to the alleged excessive force used by Staup and Corrigan.  *Peck*, 51 F.4th at 889.

Accordingly, the Court DENIES Defendants' motion for summary judgment as to the excessive force claim against Corrigan and GRANTS Defendants' motion for summary judgment as to the excessive force claim against McGinnis.

///

### 2. *Delay in Medical Care Under § 1983*

Plaintiff also alleges a § 1983 claim based on delay in medical care. The Due Process clause of the Fourteenth Amendment requires "the responsible governmental entity to provide medical care to persons who have been injured while being apprehended by the police." *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 239 (1983). In defining the contours of this duty, the Ninth Circuit held that a police officer acts reasonably by "either promptly summoning the necessary medical help or by taking the injured detainee to a hospital." *Maddox v. City of L.A.*, 792 F.2d 1408, 1415 (9th Cir. 1986).

Defendants argue the Court should grant summary judgment on Plaintiff's delay in medical care claim because the only evidence in the record is that Staup promptly called for medical assistance. (ECF No. 36-1 at 22.) Plaintiff does not address this claim in her opposition. Typically, the Court would construe Plaintiff's failure to address Defendants' arguments about a claim as abandonment of that claim. *See Est. of Shapiro v. United States*, 634 F.3d 1055, 1060 (9th Cir. 2011) (affirming summary judgment on a claim because the plaintiff "abandoned th[e] claim by failing to raise it in opposition to the [defendant's] motion for complete summary judgment"); *Jenkins v. Cty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) (noting a plaintiff "abandoned her other two claims by not raising them in opposition to [the defendant's] motion for summary judgment."). However, Plaintiff does dispute this fact in response to Defendant's statement of undisputed facts by citing Corrigan's deposition. (ECF No. 38-1 at 33.)

Absent meaningful argument from Plaintiff, the Court finds Corrigan's deposition supports Defendants' argument that the officers promptly summoned medical care. In the cited portion of the deposition, Corrigan states Staup called for medical aid immediately after the shot was fired. (ECF No. 40-1 at 85.) After confirming McGinnis and Staup were unharmed, Corrigan "briefly spoke" with McGinnis about removing the passengers from the Scion. (*Id.* at 85–86.) Corrigan then states from the time he got Adams out of the vehicle and began medical interventions, it was approximately ten minutes before fire or emergency medical services arrived at the scene. (*Id.* at 90.) As such, Plaintiff fails to persuade the Court that the officers unreasonably delayed Adams's medical care. *See Monzon*, 978 F.3d at 1164 (granting summary

13

judgment on § 1983 denial of medical care claim where "[t]he officers promptly called for medical assistance once they secured [the suspects], and the ambulance arrived within five minutes of the van finally coming to rest.").

Accordingly, the Court GRANTS Defendants' motion for summary judgment as to Plaintiff's delay in medical care claim.

### 3. *Qualified Immunity*

Defendants argue even if there was an underlying constitutional violation, the officers are entitled to qualified immunity. (ECF No. 36-1 at 22.) In opposition, Plaintiff argues there are triable issues of material fact which preclude qualified immunity, it was obviously unreasonable for officers to use deadly force against an unarmed stopped vehicle, and there was no officer in the path of the Scion at the time of the shooting. (ECF No. 38 at 20.)

Qualified immunity shields officials from civil liability where a reasonable officer would not have known that his conduct violated a clearly established right. *Anderson v. Creighton*, 483 U.S. 635, 638–39 (1987). It "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991). An officer may be denied qualified immunity at summary judgment in a § 1983 suit only if (1) the facts alleged, viewed most favorably to plaintiff, show the officer used excessive force in violation of the Fourth Amendment, and (2) the right was clearly established so a reasonable officer would have known his conduct to be unlawful. *Morales v. Fry*, 873 F.3d 817, 821 (9th Cir. 2017). "[T]he two prongs of qualified immunity balance two important, competing interests: the need to hold public officials accountable for irresponsible actions, and the need to shield them from liability when they make reasonable mistakes." *Id*. at 822.

As of the date of this incident in 2019, case law "clearly established that an officer may not use deadly force to apprehend a suspect where the suspect poses no immediate threat to the officer or others." *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010); *Longoria v. Pinal Cnty.*, 873 F.3d 699, 709–10 (9th Cir. 2017) (denying qualified immunity at summary judgment where fact and credibility issues were to be decided by a jury in a case in which an unarmed suspect was shot after a chase). Determining whether a law was clearly established does not

14

"require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074 (2011).  At the time of the shooting, it was clearly established that officers may not use deadly force against a person who is armed but cannot reasonably be perceived to be taking any furtive, harrowing, or threatening actions.  *See George*, 736 F.3d at 838; *Curnow By and Through Curnow v. Ridgecrest Police*, 952 F.2d 321, 324–25 (9th Cir. 1991); *see also Estate of Lopez by and through Lopez v. Gelhaus*, 871 F.3d 998, 1020 (9th Cir. 2017).  This is true even in circumstances in which the suspect has allegedly "committed a violent crime in the immediate past."  *See Harris v. Roderick*, 126 F.3d 1189, 1203–04 (9th Cir. 1997); *Smith*, 2018 WL 5880610, at *9 ("Decedent may have initially attacked the Responding Officers, but if Decedent no longer posed a threat, the use of deadly force violated clearly established law.").

Defendants' briefing on this issue is limited and conclusory.  (ECF No. 46-1 at 22–23.)  Defendants merely cite general legal standards and argue "there can be little doubt that all three individual officers are entitled to qualified immunity."  (*Id.*)  Defendants also argue the Ninth Circuit found no constitutional violation in *Wilkinson* and *Monzon*, so finding a Fourth Amendment violation in this case "would be a departure from existing precedent" and "qualified immunity would clearly apply."  (*Id.*)  For the reasons already discussed above, the Court finds *Wilkinson* and *Monzon* to be distinguishable from the instant case.  Defendants' other conclusory arguments are unpersuasive.

In sum, the Court concludes Staup is not entitled to summary judgment based on qualified immunity because, as established previously, there is a material issue of fact as to whether Staup violated Adams's clearly established constitutional right.  *Longoria*, 873 F.3d at 711; *Espinosa v. City & Cnty. of S.F.,* 598 F.3d 528, 532 (9th Cir. 2010) (affirming denial of summary judgment on qualified immunity because "there are genuine issues of fact regarding whether the officers violated [the plaintiff's] Fourth Amendment rights[, which] are also material to a proper determination of the reasonableness of the officers' belief in the legality of their actions"); *Lopez v. City of Mesa*, No. 22-15278, 2024 WL 3250380, at *1 (9th Cir. July 1, 2024) (affirming denial of qualified immunity where an officer shot the driver of a vehicle that was no longer in motion).

1 Moreover, Defendants fail to raise specific arguments as to why Corrigan is entitled to qualified
2 immunity for his independent actions. Accordingly, Defendants fail to persuade the Court that
3 Defendants are entitled to qualified immunity at this stage.
4       In sum, the Court DENIES Defendants' motion for summary judgment as to qualified
5 immunity.

           *4.*    *State Law Claims*

7       Defendants argue Plaintiff state law claims for battery, negligence, and violation of the
8 Bane Act fail for the same reasons already addressed as to the excessive force claim. (ECF No.
9 36-1 at 26–27.) As discussed above, the Court finds there are triable issues of material fact as to
10 the excessive force claim. Defendants' arguments as to the state law claims appear to be entirely
11 derivative of their argument as to the excessive force claim. Therefore, for the same reasons
12 discussed as to excessive force claim, the Court DENIES Defendants' motion for summary
13 judgment as to the state law claims.

         **B.**    *Monell* Claim Against the City

15       Municipalities cannot be held liable under § 1983 for unconstitutional torts of their
16 employees based solely on respondeat superior. *Monell v. Dep't of Soc. Servs. of City of N.Y.*,
17 436 U.S. 658, 693–94 (1978). Pursuant to *Monell*, a municipality is only liable under § 1983
18 when its own illegal acts are a "moving force" in the constitutional violation. *Id.* A plaintiff may
19 assert *Monell* liability based on: (1) an official policy; (2) a "longstanding practice or custom
20 which constitutes the standard operating procedure of the local government entity"; (3) the act of
21 an "official whose acts fairly represent official policy such that the challenged action constituted
22 official policy"; or (4) where "an official with final policy-making authority 'delegated that
23 authority to, or ratified the decision of, a subordinate.'" *Price v. Sery*, 513 F.3d 962, 966 (9th Cir.
24 2008) (citations omitted).
25       Defendants argue Plaintiff cannot sustain a *Monell* claim against the City because there is
26 no evidence of a constitutionally deficient policy and there is no evidence of a lack of adequate
27 training. (ECF No. 36-1 at 23–24.) In opposition, Plaintiff argues the City is liable because it:
28 (1) ratified Defendants' excessive force; (2) failed to discipline Defendants; (3) made no changes

to their policies or training as a result of the incident; (4) had a custom of failing to terminate, or even discipline, any officers in the last ten years for use of excessive force; (5) did not implement "de-escalation" training; (6) did not provide training as to how to handle a situation with a suspect in a vehicle; and (7) did not require officers to carry less lethal options or to use audio or video recording devices during critical incidents. (ECF No. 38 at 25–26.) In reply, Defendants summarily argue Plaintiff fails to describe how the City's policies are unconstitutional. (ECF No. 42 at 11.) Defendants also vaguely argue "there is no evidence offered to suggest the City ratified Plaintiff's unsupported version of events." (*Id.*)

The briefing from both sides on this issue is subpar. However, Plaintiff does cite to evidence to support its arguments on this issue in its Statement of Disputed Facts. (ECF No. 38-2 at 19–27.) For example, Plaintiffs cites several portions of the deposition of Mark Montgomery, the City's person most knowledgeable, who describes what could be perceived as deficiencies in the City's training practices, such as a lack of de-escalation training and a lack of training on how to handle suspects in a vehicle. (ECF No. 40-11 at 25–26, 43–44, 53–54, 67–68.) Arguably such deficiencies could support a *Monell* claim. *See Connick v. Thompson*, 563 U.S. 51, 64 (2011) (discussing the "possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations."). Defendants make no effort to rebut this evidence, and their reply is effectively nonresponsive to Plaintiff's opposition. As such, Defendants fail to persuade the Court that Plaintiff's *Monell* claim against the City fails as a matter of law.

Accordingly, the Court DENIES Defendants' motion for summary judgment as to the *Monell* claim.

### IV. CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment (ECF No. 36) as follows:

1. The Court GRANTS Defendants' Motion for Summary Judgment as to the § 1983 excessive force claim against McGinnis;

2. The Court GRANTS Defendants' Motion for Summary Judgment as to the § 1983

17

delay in medical care claim; and

3. The Court DENIES Defendants' Motion for Summary Judgment in all other respects.

The parties are ORDERED to file a Joint Status Report within thirty (30) days of the electronic filing date of this Order indicating their readiness to proceed to trial on Plaintiff's remaining claims and proposing trial dates.

IT IS SO ORDERED.

Date: January 7, 2025

_____
TROY L. NUNLEY
CHIEF UNITED STATES DISTRICT JUDGE