# "EXHIBIT A"

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CINDY ADAMS, as Personal Representatives to the Estate of JESSE ADAMS, and individually,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF REDDING, a governmental entity; KYLE CORRIGAN, individually, CHRISTOPHER STAUP, individually, EDWARD MCGINNIS, individually; and DOES 4 through 10,<br><br>Defendants. | Case No. 2:20-CV-01610-TLN(DMC) |

REMOTE VIDEOCONFERENCE DEPOSITION OF

KYLE CORRIGAN

THURSDAY, OCTOBER 14, 2021

Reported Stenographically by:

Jinna Grace Kim, CSR No. 14151

Job No.: 366329

the roadway back into the No. 2 lane, and that's when he started decelerating. That when I activated my overhead lights is when he had come back into the No. 2 lane.

**Q. Okay. So you had already been within two or three car lengths of the vehicle when you saw him changing lanes from the No. 2 lane to the No. 3 lane?**

A. Correct.

**Q. And then approximately how far did you guys move distance-wise before he decelerated?**

A. From the time he was in the No. 3 lane?

**Q. Yes.**

A. Not far at all. He was only in the No. 3 lane for a matter of seconds.

**Q. So essentially he drifted into the No. 3 lane for a matter of seconds, and then he decelerated, put his blinkers on, his left blinker, and started moving to the left; is that right?**

A. Yes.

**Q. And at that point in time that's when you activated your lights?**

A. Yes. Once he entered the No. 2 lane again and slowed dramatically.

**Q. And then after you activated your lights, what happened after that?**

A. The vehicle immediately yielded and turned to left

across the No. 1 lane into a parking lot on the west side of the roadway.

**Q. Did you view that as an act of compliance at the time?**

A. Yes.

**Q. And essentially he immediately turned into the first kind of parking lot that he saw that was to the left?**

A. Yes. Well, I apologize. I don't know if that's the first parking lot that he saw, but that was -- I think the first parking lot available to us on the left side of the roadway for him to turn into.

**Q. Okay.**

MR. KONZ: It's been about one hour.

Is this a good time to take a break?

MR. SINCICH: Sure. That's fine.

Let's go off the record.

(Recess taken.)

BY MR. SINCICH:

**Q. So, essentially, Officer, we left off with the suspect vehicle essentially stopped at a parking lot.**

A. Correct.

**Q. Up until that point is it fair to say that you weren't responding to a serious crime?**

MR. KONZ: Objection. Calls for a legal conclusion; vague and ambiguous.

MR. KONZ: Objection. Lacks foundation; calls for speculation.
Go ahead.
THE WITNESS: On a traditional traffic stop where you're stopped behind a vehicle, it can have that effect, but I don't believe it would have that effect in this instance where I was approaching from laterally to the vehicle or from the side of the vehicle.
BY MR. SINCICH:
**Q. Do you recall if there was any lights in the parking lot at all?**
A. I do not recall what the industrial lighting was in that area or in the parking lot specifically.
**Q. So as you're approaching the vehicle, I think you mentioned earlier you didn't know even how many occupants were in the vehicle, let alone who they were; correct?**
A. Correct. I had very little information at this point.
**Q. At that point in time dispatch had not reported back to you any information from you giving them the license plate?**
A. Correct.
**Q. So you didn't know whether or not the vehicle essentially had any kind of report of it being stolen at that point?**

A. Correct.

**Q. Is it fair to say that you didn't know if any of the occupants of the vehicle had any kind of violence or criminal history as well?**

A. Correct.

**Q. Is it fair to say that you didn't have any information that anyone in the vehicle had harmed anybody?**

MR. KONZ: Objection. Asked and answered.

He already said he didn't know anything about anybody in the vehicle. We can go through every scenarios here, I guess, but I don't understand it.

Go ahead.

THE WITNESS: I did not know about anyone in the vehicle, who they were or their history.

BY MR. SINCICH:

**Q. Okay. Did your vehicle have a bumper guard?**

A. It's equipped with a front push bumper, a metal push bumper with rubber on it, yes.

**Q. Approximately how far away from the white vehicle did you stop your vehicle?**

A. I had stopped just inside the entrance of the parking lot in the northeast corner. If I had to estimate, I would guess maybe 50 feet or so from the front of my vehicle to the back of the other vehicle, of the Scion.

**Q. I'm not sure if I heard you.**

**point in time once you got to see them?**

A. She was a white female adult, but I did not know who she was at that time.

**Q. And then after you were able to make contact and you were speaking with the driver, did you recognize the driver at all?**

A. No. I did not know who the driver was either.

**Q. At that period of time when you were having this initial conversation with the driver, did you recognize that there was anybody in the backseat?**

A. Yes. There was a Hispanic male seated the directly behind the driver in the rear left passenger seat.

**Q. Were you able to identify all three persons in the vehicle pretty much immediately when you approached?**

MR. KONZ: Objection. It's vague as to "identify."

BY MR. SINCICH:

**Q. And let me clear that. That's right.**

**Your counsel is doing a good job.**

**Were you essentially able to know that there was three people in the vehicle once you first approached and started making contact?**

A. Yes. I could clearly see all three occupants.

Felt like I could visually see the rest of the interior of the vehicle and there was nobody else that I could see aside from those three.

A. I did not.
**Q. Was the vehicle off at that period of time?**
A. No. The vehicle was still running.
**Q. Did you ever tell the driver to turn the vehicle off during this first conversation with the driver?**
A. No, I did not.
**Q. Is there a reason why you did not?**
A. It's not standard practice on a typical traffic stop. I won't have people turn the vehicle off until I either have cause to pull them from the vehicle or if I'm concerned that they might flee, or if it's a really loud vehicle and I can't hear. So I'll ask them to turn the vehicle off.
**Q. Is it fair to say that when you were asking them for his license and registration, you didn't have cause or concern that he was going to flee at that period of time?**
A. No, I did not.
**Q. I take it it wasn't a loud vehicle or anything like that?**
A. Correct.
**Q. Okay. My understanding is that the female passenger handed the driver the documents, and then he, in turn, handed them to you?**
A. That's correct.
**Q. Did you consider that an act of compliance to your**

**command to hand you the registration and insurance information?**

A. Yes. He was compliant with my request.

**Q. And what were the documents that actually got handed to you?**

A. I don't actually know what those documents are.

At that point I was having a difficult time identifying the driver, and I received information from Shascom the vehicle I was associated to was a wanted subject. So I shifted my focus to whether or not the vehicle had a valid registration and insurance to some more pressing concerns.

**Q. Let me break that down a little bit.**

**You had mentioned Shascom.**

**Is that an acronym?**

A. Yes. Well, actually, I don't believe it's an acronym. I believe it's S-h-a-s-c-o-m, and that's the name of our dispatch center. I'm assuming it's maybe Shasta communications or something, but I do not know actually what it stands for.

**Q. One way or another, Shascom is essentially the dispatcher?**

A. Yes.

**Q. So did the dispatch essentially give you information about the vehicle around the time frame that you were asking**

**for these documents and identifying the driver of the vehicle?**

A. Yes.

**Q. And what information did the dispatch give you?**

A. They asked me if I was clear for confidential information. I told them that I was, and they told me that the license plate I had provided was associated to a subject with a felony warrant that was extradited out of Washington. They described the vehicle to me, and I informed them that the description they provided matched the vehicle that I was out with, and then I was out with three occupants in the vehicle.

**Q. When they say are you cleared for confidential information, what does that mean?**

A. Some police officers have their external microphone.

It's a combination speaker microphone. Typically, you will see police officers wear it on their lapel or in the censer of their chest. Some police officers do not use an earpiece. It's not something that's required by or police department. So anyone who's standing around that officer can hear the radio traffic that's been broadcast, whether it's from other officers or from Shascom, whatever that police officer is listening to, everyone around them can hear.

I personally use an earpiece so that the radio traffic that I hear coming from my radio, only I can hear.

Nobody around me can. But, again, not all officers especially the more senior officers that have been around before the turn of or the invention of earpieces typically do not wear them. It's common practice when dispatch is advising you of some somebody you ran their information to have a warrant or the vehicle is -- comes back as stolen or something along that line. They will ask if you're clear to hear that information basically to confirm that you're not around somebody who might hear that information and motivate them to fight or flee or something along that line.

**Q. And then essentially the information was that the registered owner is the person that had the felony warrant?**

A. I don't believe it was the registered owner.

I want to say I actually don't know who the registered owner of the vehicle is, but I believe it was that the vehicle was flagged as associated to a subject who had a felony warrant.

**Q. Did it essentially indicate to you that the vehicle may have been stolen?**

A. No.

**Q. All right. I'm trying to piece that together on how it could have been someone who is not the owner of the vehicle that could have been flagged for a warrant.**

A. This is also unusual. It's the only time I've ever heard this from dispatch in regards to a plate. Usually,

plates are listed as stolen, N-C-I-C, or they're listed as maybe as missing person, associated to a missing person case, but I have never seen a plate dispatched that way.

And at the time I believed it had something to do with how Washington does business up there because they use a different system than we use.

**Q. All right.**

A. Yes. It was unusual to me as well.

**Q. So the subject associated with the felony warrant you were not sure at that point in time if it was the registered owner?**

A. Correct.

**Q. And at that point in time, did you know who the registered owner of the vehicle was?**

A. No, I didn't.

**Q. Did you know if the driver of the vehicle was a registered owner?**

A. I did not.

**Q. Did you know if the driver of the vehicle was the subject that's associated with a felony warrant?**

A. I did not.

**Q. Did you ever gather any information that the registered owner of the vehicle were one of the two passengers in the vehicle?**

A. No, I did not.

Q. Did you have any information as to what the felony warrant was for?
A. I believe it was for burglary.
Q. When you were receiving that information, approximately how long had you been on foot in front of the vehicle by that time?
A. Not very long. Maybe a few minutes at most while I was talking with the driver and getting the paperwork from the passenger.
Q. What did you do after you got this information from dispatch?
A. I tried to identify the other occupants in the vehicle. The driver did not furnish the drivers license to me. He stated that he did not have one. I asked if anyone inside the vehicle had a valid driver's license, and the female in the front told me that she did, and then she handed me a -- I believe it was a Washington State ID card, and the male in the backseat verbally provided me his name as well.
Q. Do you recall in your report whether or not you had an annotated whether the driver stated that he did not have a driver's license or that he couldn't find his driver's license?
Do you remember that?
A. I believe he said he just could not find it because he had actively pulled his wallet out and searched through

A. Correct.

**Q. Did you do that intentionally to prevent your vehicle from blocking anything?**

A. No. I -- normally on a traffic stop we try to position our vehicles behind the vehicle that we're stopping for the tactical advantage of being behind the person so they're less likely to be able to engage us. I was trying to get as close to the back half of the vehicle as I could, essentially.

**Q. Okay. So once Officer Staup and McGinnis arrived, you essentially briefed them of the information that you had?**

A. Yes.

**Q. In what location were you guys?**

A. At the driver door of my vehicle.

**Q. What did you tell them?**

A. I told them I stopped the guy for DUI. He appeared to be under the influence of both alcohol and possibly a stimulant based on my observations. I informed them that of the want association from Shascom about the person with the felony warrant and I believe that the driver was not giving me his real name. So he was likely the wanted subject.

We all put on nitrile gloves which is just a regular nitrile glove we typically put on when we know we're going to be touching somebody. I informed them that I believe the

wanted and appear to be deceptive about their name if I couldn't see where their hands were in the vehicle. None of the occupants nor the vehicle had been searched yet. So I did not know what the contents of the vehicle were, and I was unfamiliar with the vehicle and its occupants, so.

**Q. At some point in time did the driver put his hands up on the diver's wheel?**

A. He did after he was finished rolling the window up.

**Q. Did you consider that at least an act of compliance after you gave him the command to show your hands?**

A. Yes. Once he got his hands up on the steering wheel and I could see them, I got the front passenger, the female, to put her hands on the dash and the male sitting in the backseat to hut his hands on the seat in front of him where they're all visible when we finished our approach to come within arms' reach of the vehicle.

**Q. When you got within arms' reach of the vehicle, where were you standing?**

A. Near the B-Pillar still. Actually, I'm sorry.

I take that back. I was further back. I was further back than that. I know I was near the rear driver side door.

**Q. Okay. Almost next to the window where the rear passenger was?**

sweatshirt in his waist band area. I also heard Officer Staup shortly after that shout that the driver was trying to put the vehicle into gear. From where I was at, I could not see the gear shift, which was an automatic style which was in the center console of the vehicle, and I still couldn't see a good portion of the front passenger compartment just because of me being behind the B-Pillar. So based off of that information, I moved to the A-Pillar to where I was facing the driver close to the vehicle at that front B-Pillar position.

**Q. Was it important for officer safety at that point in time considering that the vehicle was still on to ensure that no officers weren't in the potential path of the vehicle?**

A. Yes.

**Q. Once you moved to the A-Pillar of the driver side and you were able to see into the cabin, did you identify any kind of weapons inside the vehicle?**

A. I did not. Just the vehicle itself that was my chief concern.

**Q. Did you ever see a gun or knife inside the vehicle at any point in time?**

A. I did not.

**Q. After you positioned yourself to the A-Pillar, did you give any further commands?**

A. Yes. I saw that the driver had his right hand on

CERTIFICATE

OF

CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

I, JINNA GRACE KIM, CSR No. 14151, a Certified Stenographic Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth;

That any witnesses in the foregoing proceedings, prior to testifying, were placed under oath;

That a verbatim record of the proceedings was made by me, using machine shorthand, which was thereafter transcribed under my direction;

Further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action, nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have subscribed my name, this date:  October 14, 2021.

Jinna Grace Kim, CSR No. 14151