# "EXHIBIT B"

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

CINDY ADAMS, as Personal Representatives to the Estate of JESSE ADAMS, and individually,

Plaintiffs,

vs.

CITY OF REDDING, a governmental entity; KYLE CORRIGAN, individually, CHRISTOPHER STAUP, individually, EDWARD MCGINNIS, individually; and DOES 4 through 10,

Defendants.

Case No. 2:20-CV-01610-TLN(DMC)

REMOTE VIDEOCONFERENCE DEPOSITION OF

CHRISTOPHER STAUP

TUESDAY, OCTOBER 12, 2021

Reported Stenographically by:

Jinna Grace Kim, CSR No. 14151

Job No.: 366328

A. I didn't see it until I pulled into the parking lot after my partner had already stopped it.

**Q. Right. But that's when you first saw it; correct?**

A. Yes.

**Q. And was it stopped initially when you first saw it?**

A. It was parked in the parking lot, yes.

**Q. And was it the parking lot of what type of place?**

A. It was some type of business off Pine Street.

**Q. So I want to ask you a few questions before you got in the parking lot about information you had related to the stop.**

**Can you tell me basically what the information you had was.**

A. I already talked to Officer Corrigan earlier in the night and told him that I was working DUI enforcement. So I told him that if he had found someone that he thought was impaired, to give me a call, and I would come do a DUI investigation.

I also recall something about either the car was wanted or the person driving it. I felt like it might have been a stolen car because at one point I used my lights and sirens to expedite my response to get there sooner. I just don't recall exactly what the information was, but it was either that the person was wanted or the car was stolen.

I wasn't quite sure.
**Q. What would be the source of that information? Would that be over your police radio?**
A. Yes, that's correct.
**Q. So whatever information you had or didn't have, you think the best source would be to listen to the dispatch recording?**
A. Yes. For sure.
**Q. Any other information that you recall having other than what you've told me so far?**
A. Not that I recall, no.
**Q. For example, did you have information as to the name of the driver of the car?**
A. I don't think so. We -- typically, we do all of our main traffic on our Channel 1 which was what I was listening to, and then when officers go to what we would call "run a subject" as for records or wants or warrants, we have a separate channel that officers will change to.
However, sometimes in the morning hours we don't have that Channel 2 available. I just don't recall if it was running that night. I just don't recall. I don't remember any names beforehand, though.
MR. KONZ: Counsel, real quick, just to clear something up, we're still talking about the time frame of what he knew before he arrived at the parking lot; correct?

MR. GALIPO: Yes, Derek. That's correct.

Then I'm going to get to if he received other information once he got there.

MR. KONZ: Okay. Thanks.

MR. GALIPO: You're welcome.

BY MR. GALIPO:

**Q. So is that clear in your mind that right now I'm talking about information you had before you got to the parking lot?**

A. Yes. I was assuming you were talking about while I was on my way there in the car.

**Q. Yes. Okay.**

**Did you have any information as to whether the person had a criminal history before you got to the parking lot?**

A. No.

**Q. Any information as to whether the person was under the influence of drugs or alcohol?**

A. Only that the sole reason that Officer Corrigan would have asked me to respond was because he believed the driver was impaired in one way or another.

**Q. I'm just wondering whether you received specific information that the person had "x" amount of beers or had been using some illicit drug, or something like that.**

A. No. Like I said, per our conversation with Officer

**that could show when you got to the parking lot and then when the call shots fired occurred?**

A. We do have a call history, but I've never looked at it.

**Q. So when you get out of your vehicle, at some point do you have a conversation with Officer Corrigan?**

A. I do.

**Q. Can you please tell me about that conversation.**

A. To the best of my recollection, it's been awhile, and I don't know at what point Officer McGinnis who was the third officer to show up arrived, but the summary and the best I can remember is, he told me that he believed the driver was intoxicated on something, possibly on methamphetamine; that it sound like the car was either wanted kind of like what I explained earlier or the subject was wanted as well out of the State of Washington; and that he was playing what we would call the "name game," meaning, that he was giving him what he believed to be a false name.

So -- and that there were -- I think he told us there were three people in the car.

**Q. Okay. And where did you have this conversation with Officer Corrigan related to the cars?**

A. We were somewhere near our cars.

**Q. Anything else you recall about your conversations with Officer Corrigan other than what you've told me so**

plates. So I don't know if it was a California plate or a Washington plate. My assumption and it would just be an assumption, is that it's probably likely it had Washington plates on it, but I just don't recall.

**Q. Okay. That's fine.**

**So you approach on the passenger side of the vehicle.**

**And do you say anything as you're approaching?**

A. I don't recall what I specifically said. I know that at some point I came around to the passenger side. I could see in the backseat and see the male subject seated on the passenger side on the rear seat, and I could see that he had some type of a -- what looked like a bulge to me in the front of like a hoody or a jacket, and I remember verbally telling Officer McGinnis that just as kind of like a heads-up, he looks like he might have something in the front of his jacket, just something to watch for, and that was as I was moving forward to the front passenger side to basically cover and keep my eyes on the female on the front passenger seat.

**Q. Did you ever actually see a weapon in the car?**

A. I didn't.

**Q. And what happened next after you're moving forward to cover the female?**

A. I believe I had to order the female several times to

**or not?**
A. He immediately reacted to the shot as in he immediately stopped moving. So then I knew that I had struck him.
**Q. And at some point were the individuals removed from the car?**
A. Yes.
**Q. Were you involved in that at all?**
A. No. I kept cover on the driver and watched him while Officers Corrigan and McGinnis removed the other two subjects, and I think they detained them.
**Q. Was the driver eventually removed from the vehicle?**
A. Yes.
**Q. And do you know who removed them?**
A. Officer Saelee who arrived shortly thereafter and myself.
**Q. And you have some background in -- is it first-aid or something like that?**
A. Yes, I do. I'm a CPR, first-aid.
And we call it a tactical-medical.
I'm an instructor for our department.
**Q. At some point did you observe the gunshot wound?**
A. I did.
**Q. And where was it to his body as you recall?**

CERTIFICATE

OF

CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

I, JINNA GRACE KIM, CSR No. 14151, a Certified Stenographic Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth;

That any witnesses in the foregoing proceedings, prior to testifying, were placed under oath;

That a verbatim record of the proceedings was made by me, using machine shorthand, which was thereafter transcribed under my direction;

Further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action, nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have subscribed my name, this date: October 12, 2021.

Jinna Grace Kim, CSR No. 14151