# "EXHIBIT F"

# EXPERT OPINION REPORT

Court: United States District Court
Case Number: Cause No. 2:20-cv-01610-TLN-DMC
Case Name: Cindy Adams, as Personal Representative to the Estate of Jesse Adams, and individually.
Vs: City of Redding, a governmental entity; Kyle Corrigan, individually; Christopher Staup, individually; Edward McGinnis, individually and Does 4 through 10.
Date: November 2, 2023

A. I, Jared L. Zwickey am an adult over 18 years of age and would be competent to testify if called as a witness in this matter. I have prepared this report on behalf of the City of Redding in the matter of _Cindy Adams, as Personal Representative to the Estate of Jesse Adams, and individually v. City of Redding, a governmental entity; Kyle Corrigan, individually; Christopher Staup, individually; Edward McGinnis, individually and Does 4 through 10_ in the Eastern District of California.

B. The San Joaquin Delta College District in Stockton, California employs me as an Associate Professor in the Administration of Justice Discipline. I recently retired as the Director of Police Services and Public Safety Programs. My duties included, but are not limited to, managing the Campus Police Department, the Basic Peace Officer Training program at Delta College and the Stanislaus Sheriff's Regional Training Center, the California Department of Corrections-Juvenile Justice Basic Institutions Academy, the Fire Technology program, and the Administration of Justice and Corrections academic programs.

C. In addition to writing curriculum and teaching college courses for the San Joaquin Community College District, I teach firearms, defensive tactics, criminal law, search and seizure, and use of force in the Basic Peace Officer Academy program and for numerous law enforcement agencies, including the California Department of Corrections, Fire Service agencies, state and federal law enforcement personnel and members of the United States military service.

D. The Yosemite Community College District in Modesto, California also employs me as an Administration of Justice adjunct instructor where I teach Administration of Justice courses at Modesto Junior College. I am also employed by the Institute of Technology as a use of force and firearms instructor.

E. As the Director of Police Services at San Joaquin Delta College, I was responsible for the oversight of personnel in the police department, full-time and adjunct employees assigned to the Administration of Justice program and students attending the POST Basic Peace Officer Academy. During the past eighteen years as an employee of San Joaquin Delta College, I have directed numerous internal affairs investigations into alleged acts of misconduct.

T. During my tenure as Police Chief for the City of Tracy I conducted and directed internal affairs investigations into alleged acts of misconduct of civilian and city employees. Based on the sustained findings of the investigations I reviewed or conducted, I administered progressive discipline to police employees, to include, but not limited to letters of reprimand, demotions, and terminations.

U. The Law Office of Kilday & Kilduff, LLP retained me on October 4, 2023, as a law enforcement policy and procedures expert to review the facts and circumstances resulting in the death of Mr. Adams on December 22, 2023, to reach an opinion on this matter.

V. On October 4, 2023, and October 23, 2023, I received a variety of written, video materials from the Law Office of Kilday & Kilduff, LLP to review.

W. Based on the materials reviewed, as well as other related opinions, I was requested to provide my opinion, favorable or unfavorable, as to the law enforcement practices and procedures the Defendant Officers used to stop, investigate, and attempt to arrest Jesse Adams on December 22, 2019, that resulted in his death.

## DOCUMENTS AND THINGS REVIEWED

1. Plaintiff's Second Amended Complaint for Damages 00038 pdf
2. City Amended Responses to Plaintiff's Roggs, Set 1
3. City Amended Responses to Plaintiff's RFA, Set 1
4. City Responses to Plaintiff's Roggs, Set 1
5. Officer Corrigan's Responses to Plaintiff's RFA, Set 1
6. Plaintiff's Responses to City's RFPD, Set
7. Plaintiff's Responses to City's Roggs, Set 1
8. Officer Staup's Responses to Plaintiff's, RFA, Set 1
9. 2023-10-03 Plaintiff's Initial Expert Disclosure
10. Office of the District Attorney, Shasta County Correspondence Dated September 4, 2020, 00012 pdf
11. Shasta County Sheriff's Office Autopsy Report Dated 12/27/2019
12. IMS Labs Toxicology Report Dated 1/23/2020 00016 pdf
13. CHP MAIT Supplemental 00037 pdf
14. Babetta Staup's Deposition Testimony Taken on February 15, 2022
15. Officer Staup's Deposition Testimony Taken on October 12, 2021
16. Cindy Adams' Deposition Testimony Taken on September 20, 2022
17. Officer McGinnis's Deposition Testimony Taken on February 25, 2022
18. Officer Corrigan's, Deposition Testimony Taken on October 14, 2021
19. Officer Montgomery's Deposition Testimony Taken on May 24, 2023
20. Skyler Leak's Deposition Testimony Taken on October 13, 2022
21. Brittany Quay Interview
22. City Audio 000001.wma
23. City Audio 000002.wav

24. City Video 000003
25. City Video 000004 avi
26. City of Redding Incident Investigation 00011.pdf
27. Shasta County Sheriff's Office Incident Report 00012 pdf
28. *Chimel v California,* 395, U.S. 752 (1969)
29. *Graham v. Connor*, 490 U.S. 386, 394 (1989)
30. *United States v. Cortez*, 449 U.S. 411,418,101 S Ct. 690,66 L.Ed.2d 621 (1981)
31. *Pennsylvania v Mimms* 434 U.S. 106 (1977) US Supreme Court
32. *Terry v. Ohio*, 382 U.S. 1, 88 S. Ct. 1868, 20 L. Ed.2d (1968)
33. *Tennessee v. Garner*, 471 U.S. 1 105 S. Ct 1694, 85 L.Ed.2d 1 (1985)
34. *Scott v Harris*, 550 U.S. 372 (2007)
35. *Graham v. Connor*, 490 U.S. 386, 394 (19890
36. *Kinney v Indiana Youth Center*, 950 F.2d 462 (7th Cir, 1994)
37. *Scott v. Heinrick* 39 F. 3d 912, 914 (9th Cir. 1994), cert. en 1995 U.S. Lexis 4312 (19585)
38. *Brower v. County of Inyo*, 489 U.S. 593, 109 S. Ct. 1378, 103 L.Ed.2d 628 (1989)
39. *Roell v. Hamilton County Ohio*, United States Court of Appeals, Sixth Circuit

## INCIDENT SUMMARY

On December 22, 2019, at approximately 3:20 a.m., Officer Corrigan observed a white Scion sedan failed to maintain travel within one traffic lane, jerking erratically within the lane and changing traffic lanes without signaling. Officer Corrigan conducted a traffic stop on the Scion. The vehicle stopped in a business parking lot located at 2174 Pine Street and Officer Corrigan stopped his patrol car behind the Scion.

The parking lot itself was relatively small, measuring approximately 80 by 40 feet. Officer Corrigan got out of his vehicle and contacted the occupants. When Officer Corrigan spoke to the occupants of the Scion, Officer Corrigan noticed that the driver displayed objective signs of being under the influence and radioed Officer Staup to conduct a DUI investigation. Officer Corrigan also believed that the driver lied to him regarding his name and date of birth.

The driver of the vehicle was later identified as a Jesse Adams. In the vehicle with Mr. Adams were two passengers, Brittany Quay, who is seated in the right front passenger seat and Sergio Flores in the rear seat on the driver side. Officer Corrigan learned from the Shasta County Dispatcher that Jesse Adams, who was wanted on an outstanding felony arrest warrant out of the State of Washington, was associated with the vehicle and license plate.

Officer Staup and Officer McGinnis arrived at the scene as cover officers. Officers Staup and McGinnis parked their patrol cars in a way that blocked the parking lot exit. Officer Corrigan briefed Officers McGinnis and Staup regarding the interactions he had with the occupants of the Scion, and he discussed a plan of action to remove the occupants and conduct a DUI investigation. Officer Corrigan also believed that the driver had lied regarding his name and his date of birth. The driver of the vehicle was later identified as Jesse Adams.

When the three officers approached the Scion, Officer Corrigan told the occupants to put their hands where he could see them. Mr. Adams replied, “for what?” Mr. Adams then began to roll up the driver’s window. Officer Corrigan yelled at Mr. Adams to put his hands on the steering wheel. Mr. Adams became argumentative, but he put his hands on the steering wheel. Officer Corrigan told Ms. Quay and Mr. Flores to put their hands up on the dash and to keep them where he could see them. Both occupants became argumentative and yelled at Officer Corrigan.

Officer Corrigan attempted to open the driver’s door to the Scion, but it was locked. He told Mr. Adams to unlock the door. Officer Staup was standing on the passenger side of the Scion, and he began shouting commands at Ms. Quay. He told Officers Corrigan and McGinnis that he could see something bulky in Mr. Flores 's sweatshirt. Officer Staup then yelled that Mr. Adams had his hand on the gear shift lever and appeared to be trying to put the Scion in gear. At this time Officer McGinnis was able to have Mr. Flores open the back door to the Scion.

Officer Corrigan was standing near the driver's side near the A pillar and saw Mr. Adams put his hands back on the steering wheel. Officer Corrigan yelled at Mr. Adams to open the door, but Mr. Adams yelled back that he was confused and didn't know why he had to open the door. Mr. Adams put his hand on the gear shift lever a second time and again attempted to put the car in gear.

Officer McGinnis was standing near the open rear door. He knew that if Mr. Adams drove the Scion backwards, he would be hit or be dragged by the car and would be severely injured or killed. Officer McGinnis drew his firearm and held it at low ready and he yelled at Mr. Adams that if he put the car into gear, he would shoot Mr. Adams.

Officer Corrigan also knew that if Mr. Adams was successful in getting his car in gear all three officers, who were standing near the car were in danger of being struck by Mr. Adams. Officer Corrigan broke out the driver side window with his baton and grabbed Mr. Adams's wrist. Mr. Adams broke free and put both of his hands on the gear shift lever and tried to put the car in gear.

As Officer Corrigan sprayed Mr. Adams with a burst of pepper spray, Mr. Adams grabbed Officer Corrigan's wrist. Officer McGinnis moved from the rear door and grabbed Officer Corrigan and pulled him backward. Officer Corrigan was able to break free of Mr. Adams grip.

On September 4, 2020, the District Attorney's Office completed an independent review of the officer-involved shooting incident involving Officer Staup and Mr. Jesse Adams. For purposes of the review, the District Attorney's responsibility is to review the evidence and make a determination as to whether there is sufficient evidence to support the filing of criminal charges. Issues of policy, training, tactics, or civil liability were not considered. The District Attorney's Office concluded that the shooting of Mr. Adams was lawful based upon a review of the totality of the materials

On January 23, 2020, evidentiary femoral blood samples taken from Mr. Adams at the time of the autopsy were analyzed by NMS labs and were found to test positive for Amphetamine, Methamphetamine and Delta -9 Carboxy THC.

**OPINIONS**

1. **OFFICER CORRIGAN WAS ACTING IN HIS OFFICIAL CAPACITY AS A SWORN PEACE OFFICER WITH THE CITY OF REDDING POLICE DEPARTMENT WHEN HE STOPPED MR. ADAMS TO INVESTIGATE HIS ERRATIC DRIVING BEHAVIOR.**

2. **THE DEFENDANT OFFICERS WORE DEPARTMENT APPROVED UNIFORMS THAT CLEARLY IDENTIFIED THEM AS PEACE OFFICERS. ANY REASONABLE PERSON WHO SAW THE OFFICERS WOULD HAVE CLEARLY RECOGNIZED THEM AS PEACE OFFICERS.**

3. **IT IS MY PROFESSIONAL OPINION THAT OFFICER CORRIGAN HAD PROBABLE CAUSE TO STOP AND DETAIN MR. ADAMS TO DETERMINE THE REASON FOR DETERMINING IF HE WAS DRIVING HIS VEHICLE WHILE UNDER THE INFLUENCE AND TO TAKE HIM INTO CUSTODY UNDER THE AUTHORITY OF A WASHINGTON STATE FELONY ARREST WARRANT.**

4. **MR. ADAMS KNEW OR SHOULD HAVE REASONABLY KNOWN THAT HE WAS BEING CONTACTED BY POLICE OFFICERS AND HAD A DUTY TO REFRAIN FROM DELAYING AND OBSTRUCTING PEACE OFFICERS IN THE PERFORMANCE OF THEIR DUTIES, AND TO COMPLY WITH THE OFFICER'S MULTIPLE COMMANDS TO STEP OUT OF HIS VEHICLE.**

5. **A REFUSAL TO COMPLY WITH AN OFFICER'S COMMANDS FOR A LAWFUL PURPOSE ADDS URGENCY AND A SENSE OF PERIL TO ANY ENCOUNTER.**

6. **MR. ADAMS HAD A DUTY TO POSSESS A DRIVER'S LICENSE WHEN OPERATING A MOTOR VEHICLE ON THE HIGHWAY, AND TO COMPLY WITH OFFICER CORRIGAN'S REQUESTS TO PRESENT PROOF OF HIS IDENTIFY UPON REQUEST.**

7. **MR. ADAMS WILLFULLY AND INTENTIONALLY RESISTED OFFICER CORRIGAN WHEN HE ATTEMPED TO DETAIN MR. ADAMS TO INVESTIGE IF HE WAS UNDER THE INFLUNCE OF ALCOHOL OR DRUGS AND TO CONFIRM HIS IDENTITY.**

8. **OFFICER CORRIGAN HAD PROBABLE CAUSE TO ARREST MR. ADAMS UNDER THE AUTHORITY OF AN OUTSTANDING FELONY ARREST WARRANT AND FOR THE COMMISSION OF FELONY AND MISDEMEANOR CRIMES, (California Penal Code 148, 245, 241) BASED ON MR. ADAMS RESISTANCE TO BEING DETAINED AND FOR ASSAULTING INNOCENT CITIZENS.**

Probable cause for arrest is a set of facts that would cause a person of ordinary care and prudence to entertain an honest and strong belief that the person to be arrested is guilty of a crime. Probable cause is required before an arrest and is based on the totality of the circumstances.

Facts that is required to establish probable cause may include, but are not limited to:
- Direct investigation or reports
- Circumstantial evidence, or
- Secondhand statements from reliable informants

Probable cause is a higher level of suspicion than reasonable suspicion. However, factors that contribute to establishing reasonable suspicion can also be used to establish probable cause or can escalate into probable cause. A peace officer's expertise and experience go into the equation for determining probable cause. For officers versed in a specific field of law enforcement, an activity, which might otherwise appear innocent, may help provide probable cause.

Although some courts continue to cite the old definition which requires an "honest and strong suspicion", the trend is toward incorporating the "fair probability" standard that applies to probable cause to search; specifically, probable cause to arrest exists if there is a "fair probability" that the suspect committed a crime.

In the absence of direct evidence, officers must rely on circumstantial evidence to establish reasonable suspicion and probable cause. In determining whether probable cause and reasonable suspicion exist, the courts apply the following principles:

**The need for Facts:** The building blocks of both probable cause and reasonable suspicion are specific facts. Sometimes one is enough. Sometimes it takes a combination of facts, but in every case, officers must have something concrete upon which to base a determination that probable cause or reasonable suspicion exist.

**Hunches:** Hunches, unsupported conclusions, and rumor are meaningless.

**Good Faith:** An arrest is not justified merely because officers had a "good faith" belief that reasonable suspicion or probable cause existed.

Officer Corrigan told Mr. Adams that he observed his vehicle drifting in the roadway which is why he had decided to pull him over. Officer Corrigan thinks Mr. Adams told him that he didn't know exactly where he was because he was from out of the area, and he had missed a turn.

Officer Corrigan saw Mr. Adams had his phone attached to the center of the steering wheel, which he thought was very unusual because if a GPS was activated when the steering wheel is turned that would change the orientation of the GPS. Officer Corrigan tried to make casual conversation with Mr. Adams and asked him if he was an Uber driver.

Officer Corrigan remembers being befuddled by the placement of the cell phone, which is why he asked him if he was an Uber driver. Mr. Adams said that he was not an Uber driver. Officer Corrigan asked Mr. Adams to give him his driver's license, vehicle registration, and proof of insurance. There was a passenger seated in the right front passenger's seat. She was a white female adult, but Officer Corrigan did not know who she was at that time. He watched her remove some registration documents from the glove box and then she handed Mr. Adams the documents, and then he in turn, handed them to Officer Corrigan.

Officer Corrigan didn't actually know what those documents were. At that point he was having a difficult time identifying Mr. Adams, when he received information from the Shascom dispatch center that the Toyota Scion was associated with a person who was wanted on the authority of a felony arrest warrant for residential burglary, robbery, assault, and unlawful possession of a firearm. Officer Corrigan shifted his focus to whether or not the vehicle had a valid registration and insurance to some more pressing concerns without sharing the confidential information with Mr. Adams.

Officer Corrigan stated the vehicle engine was still running and he didn't consider telling the driver to shut off the ignition because it is not a standard practice on a typical traffic stop. He said he would not have drivers turn the vehicle off until he either had cause to remove them from the vehicle, or when he became concerned that the driver might flee, or if it's a really loud vehicle and he can't hear the driver.

9. **OFFICER CORRIGAN HAD REASONABLE SUSPICION TO DETAIN MR. ADAMS TO DETERMINE HIS IDENTIFY AND TO LEARN IF HE POSSESSED A VALID DRIVER'S LICENSE, AND TO DETERMINE IF HE WAS LAWFULLY IN POSSESSION OF THE VEHICLE.**

10. **IT WAS APPROPRIATE FOR OFFICER CORRIGAN TO ASK MR. ADAMS TO EXIT THE VEHICLE AND TO CONDUCT A PAT SEARCH OF HIS PERSON FOR ANY DANGEROUS WEAPONS TO ENSURE THE OFFICERS' SAFETY AND TO DETERMINE IF HE LEGALLY POSSESSED THE TOYOTA SCION.**

When Officer McGinnis guided Ms. Quay to the rear of the Scion to detain her, he noticed that she was hysterical. Officer McGinnis told Ms. Quay to place her hands behind her back. She repeatedly said “ok” but she kept her hands up near her shoulders. Officer McGinnis told Ms. Quay again to place her hands behind her back but she failed to comply. When Officer McGinnis grabbed Ms. Quay’ left arm she immediately tensed up. Ms. Quay was not following instructions at which point Officer McGinnis told her to get down on the ground and he guided her towards the ground.

Ms. Quay ultimately complied and laid face down on the ground as Officer McGinnis applied one handcuff to her left wrist. Ms. Quay moved her right hand towards her right shoulder and when she was told to put her right hand behind her back she failed to comply. After Officer McGinnis gave Ms. Quay multiple commands to place your hand behind her back, Officer McGinnis had to grab her right hand and place it behind her back. Ms. Quay was placed in handcuffs; they were checked for proper fit and double locked.

Officer McGinnis secured Ms. Quay in the back of his patrol car and then went over to the driver side of the Scion to assist Officer Corrigan and Officer Saelee who had started life saving measures for Mr. Adams. Officer Corrigan asked for a BVM mask from his medical bag which Officer McGinnis knew was a Bag-Valve-Mask.

Officer McGinnis retrieved the mask from Officer Corrigan's medical bag and then walked over to the head area of Mr. Adams and properly placed the BVM mask over the mouth and nose of Mr. Adams and secured a tight seal. Officer Corrigan and Officer Salee performed chest compressions on Mr. Adams while Officer McGinnis provided respirations via the BVM mask.

Officer Corrigan, Officer Salee and Officer McGinnis performed life saving measures on Mr. Adams until medical personnel arrived on the scene and relieved them. Mr. Adams was placed on in an ambulance and transported to a local hospital for medical treatment.

12. **OFFICER CORRIGAN’S ACTIONS DID NOT CAUSE MR. ADAMS TO ESCALATE THE INCIDENT. IT WAS MR. ADAMS WHO CHOSE TO DISOBEY OFFICER CORRIGAN’S ORDERS TO PRODUCE HIS IDENTIFICATION, TO ROLL DOWN HIS WINDOW DOWN, TO SHUT OFF THE VEHICLE ENGINE, TO EXIT HIS VEHICLE, AND TO STOP TRYING TO PUT THE TRANSMISSION IN REVERSE.**

13. **THE USE OF A FORCE BY THE DEFENDANT OFFICERS TO TAKE MR. ADAMS INTO CUSTODY, IN A CASE AND MANNER OF LAW, WAS CONSISTENT WITH DEPARTMENT POLICY, LAW ENFORCEMENT POLICIES AND PROCEDURES, STATE AND FEDERAL STATUTES AND CASE LAW.**

14. **THE DEFENDANT OFFICERS REASONABLY BELIEVED THAT THEIR LIVES AND THE LIVES OF INNOCENT CITIZENS WERE IN IMMINENT DANGER OF DEATH OR GREAT BODILY INJURY WHEN MR. ADAMS USED HIS VEHICLE AS A DEADLY WEAPON TO FLEE ARREST.**

15. **THERE IS NO EVIDENCE THAT WHEN OFFICER STAUP DISCHARGED HIS FIREARM AT MR. ADAMS SEATED IN THE DRIVER'S SEAT OF HIS VEHICLE THAT THE SAFETY OF THE OCCUPANTS IN HIS VEHICLE WERE AT RISK FROM BEING INJURED.**

16. **MR. ADAMS POSED AN IMMEDIATE AND CREDIBLE THREAT OF CAUSING DEATH OR GREAT BODILY INJURY TO THE DEFENDANT OFFICERS, INNOCENT CITIZENS OCCUPING OFFICER CORRIGAN'S AND OFFICER STAUP'S PATROL CARS AND THE GENERAL PUBLIC.**

17. **THERE IS NO EVIDENCE THAT THE DEFENDANT OFFICERS EMPLOYED PURSUIT INTERVENTION TECHIQUES DURING THE TRAFFIC STOP TO PREVENT MR. ADAMS FROM USING HIS VEHICLE AS A DEADLY WEAPON TO FLEE ARREST.**

18. **OFFICER STAUP DID NOT DISCHARGE HIS FIREARM AT A VEHICLE, HE DISCHARGED ONE ROUND FROM HIS PISTOL AT MR. ADAMS AT CLOSE RANGE THROUGH AN OPEN DRIVER'S DOOR WINDOW.**

19. **ANY REASONABLE OFFICER FACED WITH THE SAME FACTS AND CIRCUMSTANCES KNOWN OR PERCEIVED BY THE DEFENDANT OFFICERS WOULD HAVE USED NECESSARY FORCE TO OVERCOME MR. ADAMS' VIOLENT RESISTANCE TO PREVENT HIM FROM CAUSING DEATH OR GREAT BODILY INJURY TO THE DEFENDANT OFFICERS, AND TO INNOCENT CITIZENS.**

20. **THERE IS NO EVIDENCE THAT THE DEFENDANT OFFICERS UNREASONABLY DELAYED PROVIDING MR. ADAMS WITH MEDICAL ASSISTANCE.**

Based on the totality of the facts and circumstances, it is my opinion that probable cause existed to place Mr. Adams under arrest for the following criminal violations.

[**California Penal Code section 148a** (1): *Every person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician, as defined in Division 2.5 (commencing with Section 1797) of the Health and Safety Code, in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment*]

**California Penal Code section 241(b**) *When an assault is committed against the person of a peace officer, firefighter, emergency medical technician, mobile intensive care paramedic, lifeguard, process server, traffic officer, code enforcement officer, or animal control officer engaged in the performance of his or her duties, or a physician or nurse engaged in rendering emergency medical care outside a hospital, clinic, or other health care facility, and the person committing the offense knows or reasonably should know that the victim is a peace officer, firefighter, emergency medical technician, mobile intensive care paramedic, lifeguard, process server, traffic officer, code enforcement officer, or animal control officer engaged in the performance of his or her duties, or a physician or nurse engaged in rendering emergency medical care, the assault is punishable by a fine not exceeding two thousand dollars ($2,000), or by imprisonment in the county jail not exceeding one year, or by both the fine and imprisonment.]*

**California Penal Code Section 245 (a) (1)** *Any person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not exceeding one year, or by a fine not exceeding ten thousand dollars ($10,000), or by both the fine and imprisonment.*

**California Penal Code section 12025 (a) (1)** *A person is guilty of carrying a concealed firearm when he or she carried concealed within any vehicle which is under his or her control or direction any pistol, revolver, or other firearm capable of being concealed upon the person.*

**California Vehicle Code section 40302** *Whenever any person is arrested for any violation of this code, not declared to be a felony, the arrested person shall be taken without unnecessary delay* ***before a magistrate*** *within the county in which the offense charged is alleged to have been committed and who has jurisdiction of the offense and is nearest or most accessible with reference to the place where the arrest is made in any of the following cases:*

**Reasonable Force Standard**

In 1989, the United States Supreme Court applied an objective standard (*Graham v Conner*) to a non-deadly force situation and further established how reasonable force must be judged objectively. The Court's analysis began by considering the suspect's Fourth Amendment right to remain free from any unreasonable seizure against the government's interest in maintaining order through effective law enforcement.

The Court noted that determining the objective reasonableness for the use of force must be fact specific and established the following four components for determining reasonableness:

- Judged from the perspective of a reasonable officer based on the same or similar facts and circumstances
- Examined through the eyes of an officer on the scene at the time the force was applied rather than 20/20 hindsight

- Based on the facts and circumstances confronting the officer without regard to the officer's underlying intent or motivation
- Based on the knowledge that the officer acted properly under the established law at the time

In the 1995 case of <u>*Tennessee v Garner*</u>, the United States Supreme Court set a four-part legal standard based on a person's Fourth Amendment protection from unreasonable acts by Peace Officers. The court established the following components and prerequisites to an officer using lethal force in the line of duty.

In order for peace officers to employ deadly force, they must meet the following:

- The officer has probable cause to believe that the suspect poses a threat of serious physical harm either to the officer or to others
- If the suspect threatens the life of an officer or another with a dangerous weapon
- The Court imposes a constitutional requirement that some warning be given, where feasible
- In order for lethal force to be constitutionally permissible there must be probable cause to believe that the use of lethal force is reasonable under the totality of the facts and circumstances

[**California Penal Code 197:** Homicide is also justifiable when committed by any person when resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person. Homicide is also justifiable when committed in the lawful defense of such person, or of a spouse, parent, child, master, mistress, or servant of such person, when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished; but such person, or the person in whose behalf the defense was made, if he or she was the assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed.

[**California Penal Code 835a**: Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use reasonable force to effect the arrest, to prevent escape or to overcome resistance. A peace officer who makes or attempts to make an arrest need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested; nor shall such officer be deemed an aggressor or lose his right to self-defense by the use of reasonable force to effect the arrest or to prevent escape or to overcome resistance.]

It is my opinion that the use of deadly force to stop Mr. Adams immediate and credible threat to the Defendant Officers, to the occupants of the Scion and the citizen ride-along citizens and the public if he were to escape was in accordance with Department policy as outlined in Subsection 1A of General Order A-11.8.

The Shasta County District Attorney's Office reviewed this case and stated the Defendant Officers were legally justified in their use of force in this incident.

Redding Police Department General Order A-11.8 - Use of Firearms/Critical Incident Investigation (1A) states:

> Firearms may be discharged by members of this Department in the performance of their duties under the following circumstances
>
> A. In the defense of themselves or other persons from the imminent, actual, or perceived threat of death or serious bodily injury. When possible, officers should issue a warning of their intent to use deadly force.

**Use of Force Options**

Law enforcement personnel have a variety of force options available to them when dealing with dangerous, combative, and violent subjects they come in contact with. The type and amount of force used in any situation depends on reasonableness of the force, based on the totality of the facts and circumstances presented to the officer at the time of the incident.

The following are facts and circumstances when deciding whether an officer may consider when deciding whether to resort to the use of force.

- The individual's overall demeanor when contacted by law enforcement.
- Whether the individual is hostile, assaultive, or non-compliant.
- Whether the individual verbally or physically threatening officers or others.
- Whether the individual responsive to verbal commands.
- Whether the individual made aggressive motions toward the officer.
- Whether the individual actively or passively resistant.
- Whether the individual is responding to an officer's commands.
- Whether the individual have the opportunity, the ability, the means, and the intent to cause the officer great bodily injury or death.
- Whether the individual is armed or likely to be armed with an instrument capable of causing death or great bodily injury to a peace officer or citizen based on the totality of the facts and circumstances.

Due to the credible threat that Mr. Adams posed, and because he escalated the situation from being static and contained, to confrontational and life threatening by putting his car in gear and intentionally ramming two occupied patrol cars and colliding with both of them. As Mr. Adams collided with Officer Staup's patrol car and pushed it backwards, the number of force options available to the Defendant Officers to control Mr. Adams was greatly limited. It is my opinion that Officer Staup discharged his firearm at Mr. Adams in accordance with the Redding Police Department Policy 300.4.1 when he reasonably believed there were no other reasonable means available to avert the threat the vehicle posed.

Mr. Adams' reckless actions while trying to drive from the incident scene had the potential to cause great bodily injury to the officers if they were to approach Mr. Adams to try to physically control him. Mr. Adams' decision to flee the scene in his vehicle created an exigent circumstance, suddenly and recklessly that left the Defendant Officers with the decision to use deadly force as the most effective means of stopping Mr. Adams from assaulting the officers and innocent citizens.

To my knowledge, based on my 38 years of law enforcement experience and forty-seven years of law enforcement training, there is no requirement for law enforcement officers to use all feasible alternatives to avoid a situation where deadly force can justifiably be used. There are, however, cases that support the assertion that where deadly force is otherwise justified under the Constitution, there is no constitutional duty to use less intrusive alternatives first.

**The Objective of Using Force**

To understand the many concepts involved in the use of force, one must first disassociate the strict concepts of offense and defense as the primary justification of use of force techniques. Use of force is often thought of and described in unspecific terms or in sports terminology.

Unlike the planned format of certain sports such as baseball and football where offensive and defensive modes are separate, use of force situations are generally not as clearly defined strictly in terms of offense and defense.

The application of physical force is more probably like the sport of boxing, in which a participant can:

- Change from offense to defense during a movement, or,
- Perform actions which are simultaneously offensive and defensive.

Therefore, to understand the use of force, it is necessary to replace offense/defense with the concept of control. The definition of control is the ability to command or direct and individual with or without voluntary compliance. One can substitute the idea that the officer will control with the subject's consent, if possible, but force the subject to comply, if necessary.

As discussed, an officer may use force when they need to establish and maintain control over a subject. Therefore, the officer may use force to:

- To effect an arrest
- To overcome resistance to lawful duties and tasks.
- In defense of oneself or others
- To prevent escape

If the officer must make an aggressive or proactive action to seize an individual who does not wish to be seized, the purpose of the seizure is to establish control over the subject, regulating his/her movements for a legal reason. If the officer is defending himself/herself or another, control must be established over the subject to neutralize the subject's capability to cause harm, but not necessarily at any cost.

The cost to the individual in terms of injury or deprivation of liberty may not outweigh the need of society to control the individual's actions. The governmental need to control must outweigh the cost to the subject being controlled. Therefore, the amount of force allowed to establish and to maintain control must be reasonable.

The primary objective for the application of force is to gain or regain control of an out-of-control person. The totality of the circumstances must be evaluated from the perspective of the officer at the scene, rather than from an outsider's benefit of hindsight.

The selection of the amount of force used by Officer Staup was based on the amount or degree of advantage that Mr. Adams possessed and the threat level that he posed to civilians seated in two patrol cars and to the Defendant Officers.

Any reasonable person in like circumstances would have complied with the officers' attempts to convince Mr. Adams to stop his violent resistance. If Mr. Adams would have complied with the officers' commands and not continued to resist in an aggressive and threatening assault to endanger the lives of the officers and civilians while trying to flee the scene of the traffic stop, he would not have been shot and lost his life.

The United States Supreme Court noted that determining the objective reasonableness for the use of force must be fact specific and established the following four components for determining reasonableness.

- Judged from the perspective of a reasonable officer
- Examined through the eyes of an officer on the scene at the time the force was applied
- Based on the facts and circumstances confronting the officer without regard to the officer's underlying intent or motivation
- Based on the knowledge that the officer acted properly under the established law at the time

It is my professional opinion that Officers Corrigan and Staup responded appropriately to their training and experience when they evaluated all of the facts and circumstances before Officer Staup made the decision to use higher levels of force to control Ms. Adams's resistance. To my knowledge and based on my thirty-eight years of law enforcement experience there is no requirement for law enforcement officers to use all feasible alternatives to avoid a situation where injuring force can justifiably be used. There are, however, cases that support the assertion that where deadly force is otherwise justified under the Constitution, there is no constitutional duty to use non-injuring alternatives first.

**Police Officers Must Use Reasonable Force**

Police officers are often forced to make split-second decisions that must be reasonable under the circumstances. In my opinion, it was reasonable for Officer Corrigan and Officer Staup to escalate using physical force to control Mr. Adams when his level of resistance elevated from being passive to aggressive, resistive, and violently assaultive and life threatening.

When a higher degree of risk to a peace officer or to the public exists, a greater use of force is justified by a peace officer.

Peace officers are vulnerable to potential harm when attempting to control a violent, resisting and potentially armed suspect. The primary goal of using force is to gain compliance of a suspect, not to cause unreasonable pain or to inflict punishment.

When using controlling or injuring force, peace officers must be constantly aware that when they attempt to control a resisting and non-compliant suspect and are extremely close to or and physically engaged with the suspect, they are vulnerable to attack. Confronting an aggressive and non-compliant individual who is intent on disobedience can be a dangerous moment for police officers. A peace officer's actions and reactions in these situations should always allow for a margin of safety while maintaining a position of advantage over the suspect.

While it makes sense for criminal law purposes to consider whether the criminal uses the force with the purpose of causing or knowingly create a substantial risk of causing death or serious bodily injury, the question is whether the officer's actions are "objectively reasonable" in light of the totality of the facts and circumstances confronting them.

It is my professional opinion, based on my extensive experience and training that any reasonably well-trained police officer, faced with the same or similar circumstances as the defendant officers knew or perceived at the time Mr. Adams became violent and assaultive, would have reasonably believed that the use of deadly force to stop Mr. Adams' assault was necessary and within acceptable law enforcement practices, policies, and procedures.

I am prepared to testify to the opinions expressed in this report in deposition or at trial if called upon to do so. If I am provided additional materials to review, I reserve the right to amend my report and offer additional opinions if necessary.

**EXHIBITS:**

None

**QUALIFICATIONS:**

See Attached Vitae

**EXPERT TESTIMONY**

See Attached Vitae